[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case raises the question as to who should bear the loss when the maker of a check stops payment on it, but the bank in which the check is deposited in a customer's account CT Page 441 issues funds against that account, which are not later repaid by the customer. The bank has brought this action against the maker of the check. The maker claims that the bank should bear the loss, and has filed a counterclaim under the Connecticut Unfair Trade Practices Act.
This unfortunate saga commenced when the named defendant, Jo-Anne Dacko, hired the co-defendant Raymond DuBack to do wallpapering and painting work at her house in Norwalk. At DuBack's request she gave him a check on and dated May 6, 1987 drawn on a joint account that she maintained with her husband at an office of Citibank on Park Avenue in New York City. The check was in the amount of $4,600 and was completely filled out in the customary manner, and made payable to DuBack. The same day, May 6, at 3:33 p. m. DuBack deposited the check in a checking account he maintained at Great Country Bank, which has its main office in Ansonia and a branch office in Shelton. DuBack had maintained the account at Great Country Bank (hereafter called "the bank") since January 13, 1987, and there had been no problems with him as a customer. Since the check was deposited after two p. m., it was carried on the bank's records for the next banking day, May 7, and delivered the same day to Union Trust Company, the commercial bank in which the bank made all its deposits. The check had been properly endorsed by DuBack, there was nothing suspicious about the check. The full amount had been deposited in DuBack's checking account.
Customary practice for the bank was to put a three day hold for payment of funds for checks drawn on other banks in Connecticut. While the bank had a three day policy, the allowable standard in the banking industry at the time for interstate checks was four days. The bank had a policy of a five day hold on interstate checks, although the maximum allowed was seven days. A statutory requirement existed to set a maximum time limit on which banks could withhold payment on checks, but individual banks could use a lesser time period within their discretion. In addition, the bank manager could override the hold and allow payment on uncollected funds. This was often done by the bank, and it occurred here because there were no previous problems with DuBack's account. At the time the deposit was made there was over $2,500 in the account, and the deposit brought the balance to over $7,000.
After the bank waived the three day hold on the deposited check, a series of checks were cleared during the next few days, including one for $3,761.41, which was presented on May 7. The series of checks presented on the CT Page 442 account through Tuesday, May 12, 1987 reduced the balance in the account to $47.09.
Meanwhile, back in Norwalk, Mrs. Dacko had understandably become concerned when DuBack did not show up to do the work on her property as promised. She called her bank, Citytrust, on Tuesday, May 12, 1987, was informed that the check has not cleared, and she placed a stop payment order on it. The next day, at three p. m. the plaintiff bank received a phone call from Union Trust informing it that the $4,600 check would be returned. The reason given was uncollected funds. After an unsuccessful attempt to contact DuBack, the bank followed customary procedures and deposited the check again on May 13 for collection. It also charged DuBack's account $12 for that transaction, reducing the balance to $35.09. On May 22, 1987 the bank received another phone call from Union Trust, indicating that the check had been returned again marked "refer to maker". This did not identify to the plaintiff exactly what the problem was. The most common reasons for returning a check unpaid are lack of an endorsement, insufficient funds, a closed account, a missing signature, uncollected funds or a stop payment order. While in fact a stop payment order had been issued at Dacko's request, this was not indicated to the bank at the time. A bank official testified that "refer to maker" usually means something else such as a stale dated check, postdated check, a possible forgery, a hold against the account for collateral, or a dispute of some sort.
The bank was unsuccessful in obtaining payment of the amount owed, $4,600 less $47.09, or $4,552.91 from DuBack, and Union Trust cancelled its endorsement on the check on May 13 and May 22, 1987. DuBack made no further deposits in the account and closed it September 30, 1987.
The first notice Dacko received that the bank was claiming the right to payment on the $4,600 check was October 29, 1987. In the meantime, she had assumed that she had successfully stopped payment on the check and had no further obligations on it. In fact in June 1987 she had agreed to pay DuBack $300 for the small amount of work that he had done not knowing at the time that money had been paid on the $4,600 check. In fact she didn't know that the bank held the check. When Dacko issued the check to DuBack she had a reasonable expectation that it would be cashed or deposited within a few days, and was not aware of the bank policy for holding, depositing and clearing checks. In defense of the bank's claim, Dacko asserts that there would be no problem if the bank had correctly identified the check as being an interstate rather than an intrastate check and held it for CT Page 443 the maximum period of seven business days. The bank counters by indicating that its policy was to hold interstate checks for three to five business days and that Dacko waited until May 12, six days after issuing the check, to stop payment on it.
The bank relies on Article 3 of the Uniform Commercial Code in claiming its right to be paid on the check. It asserts, correctly, that there was no defense to the check on the date it was submitted to the bank. Also, from the check itself and other circumstances, including no prior problems with DuBack's account, the bank had no knowledge of the underlying problem when it lifted the hold and allowed DuBack to draw on the account.
Dacko was admittedly the maker or drawer of the check. When she delivered the check to the payee, DuBack, the front of the check was complete in every respect. Section 42a-3-413
governs the contract of the maker, drawer and acceptor of checks and other negotiable instruments, and provides as follows:
 "(1) The maker or acceptor engages that he will pay the instrument according to its tenor at the time of his engagement . . . . (2) The drawer engages that upon dishonor of the draft and any necessary notice of dishonor or protest he will pay the amount of the draft to the holder or to any endorser who takes it up . . . . (3) By making, drawing or accepting the party admits as against all subsequent parties including the drawee the existence of the payee and his then capacity to endorse."
A maker agrees to pay the instrument according to its terms when made, and by making the instrument also admits as against all subsequent parties the existence of the payee and his then capacity to endorse; the contract of the maker is binding upon him upon delivery of the note. Anderson, Uniform Commercial Code, section 3-413:13. "A drawer undertakes a conditional liability that he will pay the amount of the draft to the holder, or to any endorser who takes it up, upon dishonor of the draft and any necessary notice of dishonor or protest; a drawer of a check makes an implied promise to a drawee bank that if payment of a check creates an overdraft, the drawer will reimburse the bank; . . . by drawing the instrument, the drawer admits against all subsequent parties including the drawee the existence of the payee and his then capacity to endorse; the drawer of a check is liable to the holder when the check is dishonored." CT Page 444 Anderson, Uniform Commercial Code, section 3-413:15. The principles covering this dispute are well summarized in Casanova Club v. Bisharat, 189 Conn. 591, 594, 458 A.2d 1
(1983):
 "The plaintiff's claims under our negotiable instruments law are governed by principles set down by the Uniform Commercial Code. Under the Code, a drawer, a person who issues checks, engages that, upon their dishonor and due notice of such dishonor, he will pay their face amount to their holder. General Statutes section 42a-3-413 (2). A drawer is not, however, absolutely liable and may interpose defenses to his liability. General Statutes section 42a-3-307 (2). Once a drawer has `shown that a defense exists' a person claiming the rights of a holder in due course has the burden of establishing his due course status. General Statutes section 42a-3-307 (3)."
The bank, which was in possession of the check after DuBack deposited it in his account, and which obtained possession of the check when it was ultimately returned to it after Union Trust carried out Dacko's stop payment order, is a holder of the check as defined in section 42a-1-201 (20). The holder of an instrument may enforce payment in his own name. Section 42a-3-301. "A holder who is the endorsee of the payee may sue either the payee or the maker when the instrument is dishonored and the holder is not barred by any disclaimer or election, although any payment which he receives from any party will reduce the liability of the other by that amount. From the option of joinder possessed by the plaintiff, it follows that when suit is brought against the drawer or maker, the payee-endorser is not a necessary party." Anderson, Uniform Commercial Code, section 3-413:5.
In this case the bank was a holder in due course. Section 42a-3-302 (1) of the General Statutes provides: "(1) a holder in due course is a holder who takes the instrument (a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." By accepting the $4,600 check from DuBack and crediting his bank account in that amount, the bank took the check for value. See section 42a-3-303 C.G.S. It also took the check in good faith. See section 42a-1-201 (19) C.G.S. At the time the check was deposited with the plaintiff bank on May 6, 1987 and credited to DuBack's account on May 7, the bank had no notice of any defense against the check or claim to it on the CT Page 445 part of any person. Since Dacko did not stop payment on the check by calling her bank until May 12, the check had not been dishonored on the date it was received by the plaintiff.
A holder in due course takes the instrument free from "(2) all defenses of any party to the instrument with whom the holder has not dealt" with certain exceptions. Section42a-3-305 C.G.S. To constitute notice of a claim or defense the plaintiff must have had actual knowledge of a problem, or knowledge of such facts that its action in taking the check amounted to bad faith. Hartford National Bank Trust Co. v. Credenza, 119 Conn. 368, 177 A. 132 (1935); section 42a-3-304
C.G.S. As previously noted, in order to be a holder in due course, the holder must take the instrument in good faith, section 42a-3-302 (1)(b), defined in section 42-1-201 (19) as "honesty in fact in the conduct or transaction concerned." The standard does not impose a duty of due care upon the holder, and the test is honesty in fact rather than negligence. Funding Consultants, Inc. v. Aetna Casualty 
Surety Co., 187 Conn. 637, 643, 447 A.2d 1163 (1982). The bank was not negligent in lifting the hold in the check when it did, nor would it have been negligent if it had waited several business days longer, because it did not receive notice that there was a problem with the check until three p. m. on May 13. The bank did not have notice of a problem when it released the hold on the check as uncollected funds. Section 42a-1-201 (25) provides that a person has notice of a fact when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question, he has reason to know that it exists. See 36 ALR 4th 212, 218.
Dacko admits that the signature on the check is hers. Under section 42a-3-307 (2) when a signature is admitted, production of the check entitles the holder to recover on it unless the defendant establishes a defense. This places the burden of proof on Dacko that she has a defense. Her claim is that there would have been no problem if the bank had held up giving DuBack authority to draw on the check for the maximum time period for holds on checks under section 36-9v of the General Statutes. In May 1987 the maximum time limitation on the right of a customer to draw on deposited checks for items drawn on a banking institution not located in this state was seven business days "unless such bank . . . has reason to believe that such check will not clear." Section 36-9v(a) C.G.S. [Effective October 1, 1987, Public Act 87-8 reduced the maximum time limit from seven to five business days.] It has not been shown that the bank had any reason to believe that the check would not clear. There has CT Page 446 previously been no problems with DuBack's account. Also, the statute contains a maximum time period for a hold on checks, and the bank's policy was to only hold checks for three to five days, or to waive the hold period entirely. The purpose of the hold requirement is to prevent a bank from holding checks more than the normal time period for them to clear, and by so doing, have benefit of the funds without a corresponding obligation to pay them out as the customer directs. A shorter hold period than the statutory maximum benefits the customer rather than the bank. There was nothing improper or illegal when the bank released the hold when it did, even though it may have erroneously thought that the check was drawn on a Connecticut rather than an out of state bank. The defendant has also not proven violation of a course of dealing and usage of trade as defined in section42a-1-205 of the General Statutes. There is no evidence that Dacko knew of the bank's policy or relied upon it in delaying stopping payment on the check until May 12, 1987. While the defendant has not established a defense, even if the maker or drawer shows that a defense exists, this does not defeat the plaintiff's claim, but merely shifts to the bank as the holder of the instrument the burden of proving that it is a holder in due course. Section 42a-3-307 (2) C.G.S.; Casanova Club v. Bisharat, supra, 594; Funding Consultants, Inc. v. Aetna Casualty Surety Co., supra, 640. That burden requires the holder to prove the requirements of section42a-3-302(1) for a holder in due course. Id., 640, 641.
While a customer may order his bank to stop payment on a check, provided such action is taken within a reasonable time, section 42a-4-403 (1), this does not defeat the rights of a holder in due course. Section 42a-4-407, comment 1.
Whether a bank in accepting a check is a holder in due course within the meaning of section 42a-3-302 (1) of the General Statutes is a question of fact depending upon the circumstances. See in general "what constitutes taking instrument in good faith and without notice of infirmities or defenses, to support holder in due course status, under UCC section 3-302", 36 ALR 4th 212. Cases with comparable fact patterns from other states or even ones where the bank's conduct was more questionable, have concluded that checks accepted for deposit, held in good faith and without notice of a defense and upon which immediate credit was given to the customer, could be recovered upon despite problems with the check. Exchange National Bank v. Beshara, 236 So.2d 198
(Fla.App. 1970); Pazol v. Citizens National Bank,110 Ga. App. 319, 138 S.E.2d 442 (1964); Hartford Insurance Group v. Citizens Fidelity Bank Trust Co., 579 S.W.2d 628
(Ky.App. 1979); Industrial National Bank v. Leo's Used Car Exchange, CT Page 447 Inc., 362 Mass. 797, 291 N.E.2d 603 (1973); People's Bank of Aurora v. Haar, 421 P.2d 817 (Okla. 1966); Friendly National Bank v. Farmers Insurance Group, 630 P.2d 318 (Okla. 1981); Security State Bank v. Baty, 439 F.2d 910 (10th Cir. 1971); American Exchange Bank v. Cessna, 386 F. Sup. 494 (ND Okla. 1974); Mellon Bank N.A. v. Donegal Mutual Insurance Co., 13 Pa. D. C. 3d 103, 29 UCCRS 912 (1980); First National Bank v. McKay, 521 S.W.2d 661 (Tex.Civ.App. 1975). Most of these cases were situations where the maker or drawer of the check stopped payment on it before the bank had notice of a problem.
Subject to any necessary notice of dishonor, the holder has an immediate right of recourse against the drawer upon dishonor of the check. Section 42a-3-507 (2). While a check generally must be presented within 30 days after date of issue [section 42a-3-503 (2)], section 42a-3-511 (2)(b) provides that presentment or notice or protest is entirely excused when the party charged, namely the maker or drawer "has himself dishonored the instrument or has countermanded payment or otherwise has no reason to expect or right to require that the instrument be accepted or paid." Accordingly, the drawer of a check must pay the amount of the check to a holder in due course when the check is dishonored even though he does not know that the check has been negotiated to the bank as a holder in due course. Section 42-3-413 (2) C.G.S. As stated in First American Bank v. Litchfield Co. of South Carolina, Inc., 291 S.C. 240, 353 S.E.2d 143,146 (1987):
 "The maker of an outstanding negotiable instrument is presumed to know the instrument is subject to transfer to a holder in due course . . . . The drawer is often without actual knowledge that his check has been negotiated, but that ignorance in no way diminishes the rights of a holder in due course. To hold otherwise would as a practical matter, destroy the negotiability of a check . . . . [D]elay in giving notice of dishonor does not discharge Litchfield's liability on the check."
The bank's loss resulting from Dacko's action in stopping payment on the check was $4,552.91. The plaintiff claims interest on that amount. Section 42a-3-122 (3) provides that a cause of action accrues upon demand against the drawer of the instrument following dishonor of the instrument and that notice of dishonor is a demand. Id.;353 S.E.2d at 147. This occurred on October 29, 1987 when Dacko first received notice of the bank's claim on the check. Section 42a-3-122 C.G.S. provides that interest runs at the CT Page 448 rate provided by law for a judgment from the date of demand. Laurel Bank Trust Co. v. Sahadi, 32 Conn. Sup. 172, 180,345 A.2d 53 (1975). The legal rate of interest on judgments is ten percent per year. Section 37-3a C.G.S. Interest from October 29, 1987 is $1,240.65. The plaintiff is owed $5,793.56.
Dacko has made a counterclaim under the Connecticut Unfair Trade Practices Act, section 42-110b of the General Statutes. An action can be brought under the statute by consumers where the conduct was in trade or commerce as defined in section 42-110a(4). There is a three part test to determine whether a practice is unfair. See Web Press Services Corporation v. New London Motors, Inc., 205 Conn. 479,482; McLaughlin Ford, Inc. v. Ford Motor Co., 192 Conn. 558,567-68. All three criteria do not have to be met. Id., 569n; Atlantic Richfield Co. v. Canaan Oil Co., 202 Conn. 234,242. However, there must be a showing of either an actual deceptive practice, or a practice amounting to a violation of public policy. Daddona v. Liberty Mobile Home Sales, Inc., 209 Conn. 243, 254; Web Press Services Corporation v. New London Motors, Inc., 203 Conn. 342, 355. Extensive discussion of the defendant's claim is not required. It is based on the bank's failure to maintain a hold preventing its customer from drawing on the check for the maximum time period in section 36-9v of the General Statutes. As previously discussed, the statute only imposes a maximum time period, and it is not an improper or deceptive practice or a violation of public policy for a bank to help out its customers by allowing checks to be drawn on uncollected funds in a shorter period of time. The concept urged by the defendant would create chaos in the banking industry and justify banks in holding checks for longer periods of time, the very problem that section 36-9v was designed to prevent.
The Court finds for the plaintiff on the complaint and the counterclaim. Judgment may enter for $5,793.56.
ROBERT A. FULLER, JUDGE